# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Joseph Hackenmueller,

              Plaintiff,

v.

Erik Fadden,

              Defendant.

Civ. No. 15-619 (RHK/FLN)

**MEMORANDUM OPINION AND ORDER**

---

Karin Ciano, Karin Ciano Law PLLC, Minneapolis, Minnesota, for Plaintiff.

Ryan M. Zipf, League of Minnesota Cities, St. Paul, Minnesota, for Defendant.

---

## INTRODUCTION

*Be at War with your Vices, at Peace with your Neighbours, and let every New-Year find you a better Man.* – Benjamin Franklin, *Poor Richard's Almanac* (1755 ed.)

This case arises out of a dispute gone awry between neighbors in Plymouth, Minnesota (the "City"). One of the neighbors, Charles Johnson, eventually sought the assistance of his friend, Defendant Erik Fadden, a Plymouth police sergeant. The other neighbor, Plaintiff John Joseph Hackenmueller, alleges that Fadden violated his Fourth and Fourteenth Amendment rights in his subsequent handling of the matter, in particular by falsifying a police report submitted to the City Attorney, which eventually resulted in Hackenmueller being charged with several crimes. Presently before the Court is Fadden's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion.

# BACKGROUND

## I.    A history of enmity

The pertinent facts are undisputed.  Hackenmueller, a professional musician, and his wife have lived at the same home in Plymouth since 1998.  In 2001, the property adjacent to and immediately behind Hackenmueller's home was purchased by Charles and Carley Johnson.[1]  Although Hackenmueller enjoyed good relationships with his other neighbors, he did not get along with Johnson.  According to Hackenmueller, tension first arose when Johnson sought permission from the City to construct a pole barn on his property, in order to store equipment used in his lawn care and snowplowing business.  Hackenmueller and other neighbors opposed this request, which was eventually rejected.  Hackenmueller also complained to the City about employee vehicles and other equipment coming and going from Johnson's property; the City eventually prohibited Johnson from running his business from his home.  Johnson then stopped talking to Hackenmueller.

In 2003, Johnson moved out of the home and rented it out.  Things were quiet until 2010, when Johnson decided to move back to the property with his young son.  He had the existing small house torn down and built a much larger one on the property, close to the property line.  Hackenmueller admittedly was frustrated; he testified in his deposition, "suddenly a large wall went up literally right in our back yard and just overlooking us." Several of Hackenmueller's friends commented that the new home looked like a barn,

---

[1] Though it appears the properties in question are owned by Mr. and Mrs. Hackenmueller and Mr. and Mrs. Johnson, respectively, the feud giving rise to this case largely arose between John Hackenmueller and Charles Johnson.  Accordingly, the Court refers to the respective property owners with the singular terms "Hackenmueller" and "Johnson."

and working off that theme, Hackenmueller threw a Mother's Day party in 2011 in which he set out plastic barnyard animals and played animal noises in his backyard. Johnson was displeased, although he said nothing to Hackenmueller at the time.

As a musician, Hackenmueller often would sing or play guitar in his backyard. He also enjoyed listening to music while working in his garden or engaging in other activities inside and outside his home. The Johnsons began complaining to Hackenmueller about the noise, which they felt was unnecessarily loud and was preventing their son from sleeping. In one instance, Hackenmueller responded that Johnson's son "needs to learn to sleep through some shit."[2] According to Hackenmueller, he attempted to placate Johnson by replacing his "professional" speaker with small computer speakers when he was listening to music in his backyard. Johnson, however, continued to believe Hackenmueller was excessively noisy.

In June 2011, Johnson had an off-duty conversation with Fadden. The two are good friends and have known each other since high school; each served as a groomsman at the other's wedding. Johnson mentioned his concerns with the noise emanating from Hackenmueller's property, including the barnyard-animals incident. Johnson felt Hackenmueller was engaged in a campaign of harassment because of the large home he had built close to Hackenmueller's property. The record does not disclose whether Fadden thought the noise violated the City's noise ordinance, which generally prohibits

---

[2] In his deposition, Hackenmueller could not recall whether he had used an expletive but acknowledged that he "may have" done so.

unreasonably loud noises.[3]  Nevertheless, Fadden told Johnson he should document incidents of excessive noise and record them, as police officers often arrive to noise complaints long after excessive noise has stopped.  Johnson took that advice and began preparing a log of noise incidents and videotaping them.  And in 2012, he began bringing his noise complaints to the police.

## II.   Excessive-noise complaints begin

The first documented incident occurred on April 11, 2012.  Then, Plymouth police officer Matthew Gliniany was dispatched to Johnson's home in the early evening after Johnson called in a noise complaint.  Upon arrival, Gliniany heard no sound that he believed violated the City's noise ordinance.  He spoke with Johnson, who explained that Hackenmueller had been playing guitar and other loud music in his backyard since Johnson moved back to the property in 2011.  He also recounted the barnyard-animal incident and claimed Hackenmueller frequently directed a large speaker toward Johnson's home.  Gliniany advised Johnson to immediately report future noise complaints, and he then left to speak with Hackenmueller.  Gliniany advised Hackenmueller that he had received a noise complaint from Johnson, and Hackenmueller acknowledged earlier playing music but denied it had been too loud.  As Gliniany heard nothing he thought unreasonable, he advised Hackenmueller of the noise ordinance,

---

[3] The City's Code prohibits "any distinctly and loudly audible noise that unreasonably annoys, disturbs, injures, or endangers the comfort, repose, health, peace, safety, or welfare of any persons or precludes their enjoyment of property or affects their property's value."  Plymouth, Minn. City Code § 2025.03, subd. 1.

asked him to use "common sense" with regard to noise in the future, and then left and prepared a written report of the encounter.

Police were called back to Johnson's home a few hours later; officer Kyle Kvenild responded. Johnson complained that after the earlier call, Hackenmueller had played "very loud" music for a short time and then turned it off. Johnson also reported that Hackenmueller later pointed a large speaker at his home and played music extremely loud for several minutes, which is what caused Johnson to call the police again. He reiterated the concerns he had expressed to Gliniany about noise being directed at his home, especially when his wife and child were home alone, and he expressed that he believed it was because Hackenmueller was upset Johnson had built a large house next to his property.

Kvenild then went to speak to Hackenmueller. He heard no excessive noise at Hackenmueller's home, although Hackenmueller acknowledged having played a CD through an open window while he was grilling earlier that evening. Kvenild reviewed the noise ordinance and explained that noise complaints were viewed differently between 10 p.m. and 7 a.m. than noise complaints received during the day (when more noise is permitted). Hearing nothing that violated the law, Kvenild then left and prepared a written report, noting among other things that Hackenmueller had told Kvenild he was upset Johnson had constructed such a large home next door.

Officers were called back to the area approximately two weeks later, in the early afternoon on April 23, 2012. Officer Amy Therkelsen responded to the call. Johnson's wife complained to Therkelsen about noise emanating from Hackenmueller's house, but

Therkelsen only heard music playing on computer speakers through Hackenmueller's open windows, which did not strike her as unreasonably loud.  Therkelsen walked over to Hackenmueller's home and advised him there had been a noise complaint.  Though she told Hackenmueller she did not believe the music he was playing was excessive for the time of day, she advised that he should consider closing the windows or tuning down the music in the evening.  Therkelsen then left and prepared a written report documenting the incident.

Therkelsen took another complaint from Johnson later that day.  Johnson called to report that after Therkelsen had left the scene, Hackenmueller went into his backyard playing guitar and signing "towards his house," which Johnson felt was harassment; he wanted to press charges.  Therkelsen recommended mediation between the neighbors, but Johnson refused.[4]  In her subsequent report, Therkelsen noted she had advised Johnson that although Hackenmueller might be "irritating," the noise she heard "does not fit the criteria to be a noise ordinance violation," and in response, Johnson stated that he would likely be calling the police again that evening, when his son went to sleep around 7 p.m.  Therkelsen retorted that the police response probably would be the same if the complaint came in before 10 p.m.

## III.    Fadden gets involved

On June 5, 2012, Johnson called Fadden while he was on duty and asked to discuss his ongoing problem with Hackenmueller.  He later visited Fadden at the Plymouth police station, where he presented a handwritten log of what he believed were

---

[4] The City offers to mediate neighbor disputes.

excessive-noise incidents, as well as two DVDs containing recordings of Hackenmueller in his backyard.  Johnson also told Fadden he had a photograph of Hackenmueller peering over his fence and into his home, but he did not provide such a photo at the meeting.

Fadden and Johnson spoke about the incidents in the log, and Fadden then prepared a report of the evidence presented to him by Johnson.  (The report is Exhibit 14 to the Affidavit of Ryan Zipf.)  Specifically, the report provided "a summary of Johnson's account" of the incidents in question, and it noted that Johnson's logs and the DVDs he had prepared were logged into evidence at the police department.  The report also referenced, and attached copies of, the previous police reports prepared by Gliniany, Kvenild, and Therkelsen.

According to the report, Johnson indicated that he had been having issues with Hackenmueller since returning to the property in 2011.  He recounted the barnyard-animal incident and advised that on several subsequent instances, including at times on an almost daily basis, loud noises began emanating from Hackenmueller's house shortly after Johnson or his wife arrived home.  In one instance, according to the report, Johnson advised that he returned home to find Hackenmueller hiding behind a tree on his (Hackenmueller's) property and looking into the back of Johnson's home.  The report also documented an incident in which Hackenmueller began banging on his barbeque grill shortly after Johnson had put his son to bed.  When Johnson attempted to speak to Hackenmueller about it, he called Johnson "an asshole."

The report also purported to contain a "summary of the video clips" on the DVDs. It indicated that on several occasions, the Johnsons arrived home and Hackenmueller began singing "loudly" and playing music shortly thereafter. For example, it provided: "5/29/12: Johnson's [*sic*] arrived home at 1215 hrs and Hackenmueller began singing and playing music." The report did not expressly state that Fadden had watched the DVDs; it purported merely to provide a "summary" of the videos. Fadden acknowledged in his deposition, however, that he reviewed the videos before preparing the report. He understood from Johnson that hours upon hours of video had been recorded and that Johnson had provided only snippets from his recordings. Fadden testified in his deposition, however, that he did not notice anything suggesting the videos had been *altered.*

At the end of the report, Fadden cited the City's noise ordinance and another portion of the City Code prohibiting a homeowner from making noise "that will in any way have an objectionable effect upon adjacent properties." "Based on th[e] information" in the report, Fadden "respectfully request[ed]" that the matter be "forwarded" to the City attorney "for review of possible charges for Hackenmueller for violating City [] Code 2025.03," the noise ordinance. Fadden sent his report to Detective Sergeant Chris Kuklok, as he believed it was better for someone else to handle the matter going forward in light of his pre-existing relationship with Johnson. Kuklok conducted no additional investigation and did not review Johnson's DVDs or the complaint log. Rather, he simply forwarded the file on to the City Attorney's office.

## IV.     Hackenmueller is charged

The City Attorney's office has electronic access (through its "LETG" system) to police department files and can obtain evidence in the police department's possession before making a charging decision.  Here, however, City Attorney Elliott Knetsch reviewed Fadden's report and the reports of the other officers, but not the underlying DVDs created by Johnson or the incident log.  Ultimately, he opted to charge Hackenmueller not only with violating the City's noise ordinance, but also with disorderly conduct and stalking, a gross misdemeanor; the last charge was based on Knetsch's belief that Hackenmueller seemed to be monitoring Johnson's property. Knetsch prepared and signed a criminal complaint charging Hackenmueller with the aforementioned crimes.  He also prepared a "Statement of Probable Cause" supporting the criminal complaint, which Gliniany signed.[5]  There is no evidence in the record that Hackenmueller was arrested or handcuffed; rather, he appeared on his own in Hennepin County District Court in response to a summons.  Hackenmueller alleges, however, that at a second court appearance, he was led from the courtroom and required to be fingerprinted and photographed.

After the criminal case was commenced, a different attorney, Alina Schwartz, handled the City's court appearances in the matter.  In preparing for a Rasmussen

---

[5] Hackenmueller's Amended Complaint alleges that Fadden directed Gliniany to prepare and sign the Statement of Probable Cause.  (Am. Compl. ¶¶ 42, 89, 102.)  He cites no evidence to support that contention, however, and he has not addressed it in his brief.

hearing,[6] Schwartz reviewed the underlying DVDs Johnson had prepared; she noticed nothing untoward.  Hackenmueller's defense counsel, however, raised questions regarding the authenticity of the videos.  Together they watched the recordings, and it then appeared to Schwartz that the audio on the recordings had in fact been doctored. She then dismissed all of the charges against Hackenmueller.

## V.      Litigation results

On February 2, 2015, Hackenmueller commenced this action in the Hennepin County District Court; Fadden timely removed it to this Court.  His Amended Complaint[7] alleges that Fadden violated his Fourth Amendment rights by falsely representing in his report that the evidence proffered by Johnson corroborated his noise complaints, which led to him being charged by the City Attorney.  It also alleges that Fadden engaged in "conscience-shocking conduct" in violation of the Fourteenth Amendment by forwarding his "false" report to the City Attorney.[8]  With discovery complete, Fadden now moves for summary judgment on Hackenmueller's claims.  The Motion has been fully briefed and is ripe for disposition.

---

[6] A Rasmussen hearing is a type of omnibus evidence-suppression hearing.  See Minnesota ex rel. Rasmussen v. Tahash, 141 N.W.2d 3 (Minn. 1966).

[7] The Court struck Hackenmueller's 58-page, 479-paragraph initial Complaint for violating Federal Rule of Civil Procedure 8(a)(2).  (See Doc. No. 4.).  Hackenmueller then filed a slightly better 24-page, 116-paragraph Amended Complaint (Doc. No. 5).

[8] Hackenmueller also brings a state-law claim for malicious prosecution, which the Court has not addressed because it declines to exercise supplemental jurisdiction over it.  (See infra at 20.)

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

**ANALYSIS**

**I.    Causation**

Hackenmueller asserts that Fadden violated (1) his Fourth Amendment right to be free from unlawful seizures, that is, seizures without probable cause, and (2) his Fourteenth Amendment right to substantive due process, which prohibits "arbitrary" governmental conduct.  Each of these claims is brought under 42 U.S.C. § 1983, which is the vehicle through which federal constitutional rights are vindicated.  E.g., Midwest Foster Care & Adoption Ass'n v. Kincade, 712 F.3d 1190, 1196 (8th Cir. 2013).  But

constitutional violations in the ether, so to speak, will not suffice.  Rather, a defendant is

liable for a constitutional violation under § 1983 only if his conduct *caused* the violation.

See, e.g., Hayden v. Nevada Cnty., Ark., 664 F.3d 770, 773 (8th Cir. 2012) ("Causation

is an essential element of a section 1983 cause of action.") (quoting Morton v. Becker,

793 F.2d 185, 187 (8th Cir. 1986)); Zutz v. Nelson, 601 F.3d 842, 851 (8th Cir. 2010)

("§ 1983 demands more than a simple claim that the appellees engaged in wrongful

conduct and the appellants were deprived of constitutional rights.  Indeed, to state a cause

of action under § 1983, a plaintiff must plead facts that would tend to establish that the

defendant's wrongful conducted *caused* the constitutional deprivation.") (emphasis in

original); see also Martinez v. California, 444 U.S. 277, 285 (1980) ("[N]ot every injury

in which a state official has played some part is actionable.").  In the Court's view,

causation poses an insurmountable hurdle for Hackenmueller's unlawful-seizure and due-

process claims here.

Causation issues under § 1983 are analyzed under the common law.  See, e.g.,

Carey v. Piphus, 435 U.S. 247, 266-67 (1978) (looking to common law of torts to

determine damages for § 1983 claim); Doran v. Eckold, 362 F.3d 1047, 1050 (8th Cir.

2004), rev'd on other grounds *en banc*, 409 F.3d 958 (8th Cir. 2005) ("[I]ssues of

causation in § 1983 suits are decided by looking to the common law.").  Under Minnesota

law, causation is determined using a "substantial factor" test, pursuant to which a

defendant's conduct will be found to have proximately caused harm if it was "a

substantial factor in the harm's occurrence."  George v. Estate of Baker, 724 N.W.2d 1,

10 (Minn. 2006).  Nevertheless, a "superseding, intervening event" can break the chain of causation.  Wartnick v. Moss & Barnett, 490 N.W.2d 108, 113 (Minn. 1992).

Here, Hackenmueller argues that Fadden's "false" report caused him constitutional harm because it set the wheels in motion for him to be charged.  For example, he asserts that Fadden violated the Fourth Amendment when he "ask[ed] the City Attorney to consider criminal charges that were plainly not supported by" Johnson's doctored evidence.  (Mem. in Opp'n at 29-30.)  Indeed, absent the criminal charges being levied against him, Hackenmueller would have suffered no "harm" whatsoever.

The problem with this theory is that it is undisputed Fadden did not charge Hackenmueller.  Rather, the charging decision was made by the City Attorney alone, in the exercise of his independent judgment.  (See Knetsch Dep. at 6 ("The reports were forwarded to my office by the Plymouth Police Department, they were given to me to be reviewed, and I did review them and made a charging decision."); see also Schwartz Dep. at 39 ("[T]here were no charges until this formal complaint came out, and none of the officers charged Mr. Hackenmueller.  It was our office [that] made the charging decision.").)  In such a situation, the prosecutor's independent exercise of discretion breaks the chain of causation.  See, e.g., Ames v. United States, 600 F.2d 183, 185 (8th Cir. 1979); Arnold v. Hoelscher, No. 1:10-CV-187, 2011 WL 1226901, at *3 (E.D. Mo. Mar. 30, 2011) (fact that investigator "signed a complaint which resulted in [the plaintiff's] arrest, without more, does not provide the necessary nexus between act and injury because an independent entity chose to arrest and prosecute plaintiff"); Flowers v. City of Minneapolis, Civ. No. 05-2484, 2007 WL 2893349, at *9 (D. Minn. Sept. 28,

2007) (Tunheim, J.) ("Officers cannot be held liable for the initiation of . . . criminal proceedings where the chain of causation between a police officer's unlawful arrest . . . and a subsequent [prosecution] is broken by the intervening exercise of independent judgment.") (internal quotation marks and citation omitted).  Indeed, courts often recognize a *presumption* that "the prosecutor filing a criminal complaint exercised independent judgment in determining that probable cause for an accused's arrest existed, thereby breaking the chain of causation . . . and immunizing investigating officers from damages."  Beck v. City of Upland, 527 F.3d 853, 862 (9th Cir. 2008).

True, this rule is not absolute.  A chain of causation is *not* broken, despite an independent charging decision, where the record reveals an instigating officer presented false evidence to, or withheld exculpatory evidence from, the prosecutor.  E.g., Ames, 600 F.2d at 185; Richardson v. Turpitt, Civ. No. 06-4251, 2008 WL 3911276, at *15 (D. Minn. Aug. 19, 2008) (Doty, J.).  In the Court's view, however, even assuming *arguendo* that Fadden had "falsified" the report,[9] the record does not create a genuine issue

---

[9] Hackenmueller appears to overstate the report's so-called "falsity."  He argues Fadden "misrepresented what he *saw and heard*" when he "summarized the contents of" Johnson's DVDs.  (Mem. in Opp'n at 16.)  But the report nowhere states Fadden *saw* or *heard* anything; it does not provide that Fadden had actually reviewed the videos.  Moreover, the report repeatedly indicates it is providing a summary of *Johnson's account* of the incidents depicted.  (See Zipf Aff. Ex. 14 at 1 ("The following is a summary of Johnson's account."); id. at 1-3 (providing "Johnson states" or "Johnson stated").)  And while the report purports to provide a "summary of the video clips," perhaps suggesting that Fadden had reviewed the videos himself, it also states that the videos were "attached . . . to this [report] *for review* as well as the incident log written by Johnson."  (Id. at 3 (emphasis added).)  In this Court's view, it makes little sense for Fadden to lie about the contents of the DVDs and then attach them to his report.  In addition, Hackenmueller suggests Fadden *should have known* the videos were doctored, but the Court's review of the videos leads it to conclude such a determination was not obvious.  Indeed, Schwartz testified in her deposition that she reviewed the videos and did not perceive any

"whether the prosecutor merely relied on the reports rather than exercising [his]

independent judgment." <u>Richardson</u>, 2008 WL 3911276, at *16.

To be sure, the City Attorney testified in his deposition that he did not review any

of the underlying evidence, but simply read Fadden's report and the reports of the other

officers who had responded to noise complaints by Johnson.  Yet, Fadden forwarded his

report – along with the reports of the other officers, who had thrice found *no* noise

violations – to the City Attorney "for *review of possible charges* for Hackenmueller for

violating" the City noise ordinance.  (Zipf Aff. Ex. 14 at 4 (emphasis added).)  Contrary

to Hackenmueller's argument (<u>see</u> Mem. in Opp'n at 29), Fadden nowhere stated in the

report that he believed probable cause existed.  Rather, it was the City Attorney who

conducted the subsequent review and decided to charge Hackenmueller with crimes –

including stalking and disorderly conduct, which were nowhere suggested or even

mentioned in Fadden's report.  The inclusion of additional charges alone suggests the

City Attorney exercised sufficient independent judgment in charging Hackenmueller.

Furthermore, all of the underlying evidence, including the "doctored" DVDs, was

expressly referenced in Fadden's report and, undisputedly, was available to the City

Attorney before making a charging decision.  He opted not to review that evidence,

however, in yet another exercise of his discretion.[10]  Nor did he choose to ask for

---

apparent alteration; it only became clear to her after defense counsel raised the issue in the
underlying criminal case.

[10] Hackenmueller argues, without citation to the record, that Fadden "kn[ew] the prosecuting
authority [was] likely to rely on his report without viewing the video[s]."  (Mem. in Opp'n at
31.)  But the evidence does not support that assertion; the record simply indicates Fadden was

additional investigation, which he had the authority to do (and which he has requested in other instances).  (See Knetsch Dep. at 24.)  His decision not to review the underlying evidence, or to ask for further investigation, confirm that the ultimate charging decision was his own.  Finally, there is no suggestion the City Attorney was *required* to charge Hackenmueller simply because of Fadden's allegedly false report; it is undisputed he could have opted *not* to charge him.[11]

Under the circumstances, the Court concludes there is no genuine issue that the City Attorney's charging decision broke the chain of causation, regardless of whether Fadden intentionally falsified information in his report.  Hackenmueller's constitutional claims thus fail.

---

aware the City Attorney would "have to go to some pains" to get the underlying videos (id. at 18 (citing Fadden Dep. at 128)), not that he believed they would not be reviewed at all.

[11] Hackenmueller makes much of the friendship between Fadden and Johnson, which is not mentioned in the report.  But it is undisputed that Fadden disclosed the relationship to his supervisor, Captain Jeff Swiatkiewicz, who expressed no concerns.  It is also undisputed Fadden contacted Schwartz in June 2012 to inquire whether it was acceptable for him to be involved in the matter given his friendship with Johnson.  Although Schwartz could not recall the particulars of that conversation, she testified in her deposition that she typically tells officers in such a situation that as long as the evidence is sufficient to charge a crime, the officer can charge a suspect even if he or she knows the victim.  Furthermore, once Fadden drafted the report, he extricated himself from the charging process, including any subsequent follow up, because of his pre-existing relationship with Johnson.  See Cherry v. Garner, No. Civ. A. 03-01696, 2004 WL 3019241, at *10 (E.D. Pa. Dec. 30, 2004) (dismissing Fourth Amendment claim against school police officer when city made charging decision and there was "no indication in the record that [the defendant] played any active role in [the plaintiff's] prosecution following her detainment" by the defendant for an altercation at school).

## II.    Other problems

The Court pauses to note two additional problems with Hackenmueller's constitutional claims.

First, as to the Fourth Amendment, it does not appear that Hackenmueller was "seized" by Fadden.  U.S. Const. amend. IV (prohibiting "unreasonable searches and seizures").  Fadden did not arrest him.  He did not handcuff Hackenmueller or otherwise detain him.  Indeed, he had no face-to-face contact with Hackenmueller whatsoever.  Nothing in the record suggests that Fadden, "by means of physical force or show of authority[,] in some way restrain[ed]" Hackenmueller's liberty.  McVay v. Sisters of Mercy Health Sys., 399 F.3d 904, 908 (8th Cir. 2005).

Recognizing this, Hackenmueller argues he was seized "for Fourth Amendment purposes, when he was booked, fingerprinted and photographed at his court appearance." (Mem. in Opp'n at 26.)  Although he acknowledges the Eighth Circuit has never expressly held the booking process alone is sufficient to constitute a seizure (id.),[12] he points to cases from other circuits so holding.  The Court is unconvinced.  In at least one instance, our Circuit has noted that a custodial fingerprinting during the booking process is so "routine" as to not even implicate Fourth Amendment rights.  Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 842 (8th Cir. 1998).  This accords with the notion that Fourth Amendment claims are designed to strike a balance between the nature and quality of the government's intrusion on an individual's Fourth Amendment interests and

---

[12] Curiously, despite recognizing there is no controlling law on the issue, Hackenmueller argues "[t]here is no dispute that [he] was seized."  (Mem. in Opp'n at 26.)

the governmental interests justifying the intrusion.  E.g., United States v. Place, 462 U.S.

696, 703 (1983).  While not insubstantial, a fingerprinting or a photograph constitutes

less of an intrusion on an individual's right to be free from unlawful seizures than an

arrest or detention, while on the other side of the equation, there are important

governmental interests in the booking process, most notably correctly identifying the

individual to ensure he is actually the person charged.

Furthermore, Fadden was not involved in the booking process.  Hackenmueller

argues he is nevertheless responsible for Hackenmueller's "seizure" because

constitutional tortfeasors "may be held accountable for the natural and probable

consequences of their actions."  (Mem. in Opp'n at 27.)  But Fadden did not sign the

criminal complaint or the "Statement of Probable Cause" that initiated the criminal case

and, later, resulted in Hackenmueller being booked.  And, although he submitted a report

for *review* for charges, as already noted the charging decision was made by the City

Attorney.  The Court cannot conclude, on the facts here, that Hackenmueller's booking

was the "natural and probable consequence" of Fadden submitting a report (even a

falsified one) to the City Attorney.

Second, as to the substantive-due-process claim, Hackenmueller notes Fadden

acknowledged in his deposition that the "fabricated and inauthentic" videos were

insufficient to support a finding of probable cause, "yet he forwarded them to the City

Attorney anyway."  (Mem. in Opp'n at 31.)  He contends such "reckless" conduct shocks

the conscience and, accordingly, violates the Fourteenth Amendment's substantive-due-

process clause.  See, e.g., Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002)

(substantive-due-process claim requires "conscience shocking" conduct).

But it is undisputed Johnson's videos did not capture every instance of excessive

noise about which he complained.  A victim's complaints alone typically are sufficient to

establish probable cause.  E.g., United States v. Nguyen, Crim. No. 06-192, 2006 WL

3486993, at *6-7 (D. Minn. Dec. 4, 2006) (Magnuson, J., adopting Report &

Recommendation of Nelson, M.J.) (unlike statements from informants, statements from

victims are presumed credible and do not require corroboration to establish probable

cause).  Although the videos may not have substantiated many of Johnson's complaints,

they at least corroborated certain contentions (such as calling Johnson an "asshole").

Moreover, there is some question whether the videos were "obviously" doctored, and

both they and Johnson's logs were available to the City Attorney.  And, Fadden's report

included the reports of other officers who had determined that no noise violations had

been established on the occasions they responded to noise complaints.  Even if some

doubt may have existed about the authenticity of Johnson's evidence, and even if the

videos alone were not enough to establish probable cause, the Court does not believe the

circumstances here suggest that by forwarding his report and other evidence for "review

for possible charges," Fadden engaged in conduct that was "so egregious, so outrageous,

that it may fairly be said to shock the contemporary conscience."  Hall v. Ramsey Cnty.,

801 F.3d 912, 917-18 (8th Cir. 2015) (quoting Cnty. of Sacramento v. Lewis, 523 U.S.

833, 847-48 n.8 (1998)); accord Moran, 296 F.3d at 647 (substantive due process "is

concerned with violations of personal rights . . . so severe . . . and so inspired by malice

- 19 -

or sadism rather than a merely careless of unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power").

## III.   The malicious-prosecution claim

For all of the foregoing reasons, Hackenmueller's constitutional claims fail, leaving only his malicious-prosecution claim for resolution.  Yet, subject-matter jurisdiction in this action is premised on the existence of a federal claim.  Jurisdiction over the state-law claim exists solely by virtue of the supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state-law claims forming part of the same "case or controversy" as federal claims.  The exercise of supplemental jurisdiction is discretionary, however, and where all federal claims have been dismissed prior to trial, "even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); accord, e.g., Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004).  Accordingly, the Court declines to exercise supplemental jurisdiction over Hackenmueller's state-law claim, and it will be dismissed without prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Fadden's Motion for Summary Judgment (Doc. No. 19) is **GRANTED IN PART**.  Hackenmueller's federal claims (Counts I and II of the Amended Complaint)

are **DISMISSED WITH PREJUDICE** and his state claim (Count III of the Amended

Complaint) is **DISMISSED WITHOUT PREJUDICE**.[13]

        **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  July 22, 2016                   s/Richard H. Kyle
                                      RICHARD H. KYLE
                                      United States District Judge

---

[13] See 28 U.S.C. § 1367(d).